## Case No. 16,903.
VAUGHAN v. WILLIAMS.

[3 McLean, 530; 3 West. Law J. 65; 8 Law Rep. 375.] [1]

Circuit Court. D. Indiana. May Term, 1845.

CONSTITUTIONAL LAW—ORDINANCE OF 1787—FUGITIVE SLAVES—RESCUE—FORFEITURE OF PROPERTY IN SLAVES.

1. The provision in the constitution of the United States. and in the act of congress of 1793 [1 Stat. 302]. in regard to the surrender of a fugitive from labor. is binding on the state of Indiana, and its citizens, the same as on the other states.

2. A repugnancy between the compact in the ordinance of 1787, and the constitution. necessarily repeals the ordinance.

3. Indiana. by coming into the Union under the constitution, consents to this, and the other party to the compact consents by receiving the state into the Union. This is the common consent required by the ordinance to annul it in part or wholly.

4. Full effect must be given to the constitution and law of congress.

5. The laws of Missouri sanctioning slavery must be respected, and rights under them enforced.

6. Courts are not to discuss slavery in the abstract, or the policy of slave laws.

7. An individual is liable to the penalty for a rescue, if he be present and encourage it.

[Cited in Weimer v. Sloane, Case No. 17,363.]

8. It is not necessary that he should put forth his hand to do the act.

[Cited in Weimer v. Sloane, Case No. 17,363.]

9. An owner of slaves, who takes them to the state of Illinois, and keeps them at labor six months. and then removes them to Missouri, forfeits his right to them as slaves.

[Cited in Anderson v. Poindexter, 6 Ohio St. 629.]

At law.

O. H. Smith and Mr. Wick, for plaintiff.

Quarles. Stevens & Bradley, for defendant.

McLEAN, Circuit Justice. The plaintiff, a citizen of Missouri, brought his action against the defendant, for rescuing from his possession certain slaves of the plaintiff, and fugitives from his service, whom he found and arrested in the state of Indiana. The defendant demurred to the declaration. As the principal ground of the demurrer it was insisted, that the fourth article of the constitution of the United States. in regard to the delivery of fugitives from labor. and the act of congress on the same subject, do not apply where the claim is made by a citizen of a new state, not within the territorial limits of the Union at the adoption of the constitution. And that a citizen of Indiana is not bound by such provisions. That the sixth article of the ordinance of 1787, which remains in full force in Indiana, requires a fugitive from labor to be delivered up only when "claimed in any one of the original states." And that as the alleged slaves es-

[1] [Reported by Hon. John McLean, Circuit Justice. 8 Law Rep. 375, contains only a partial report.]

caped from the state of Missouri, where the plaintiff still resides, neither the act of congress nor the constitution can apply to the case.

This question, I believe, for the first time is brought directly before the circuit court of the United States. It is admitted that the common law imposes no obligation on a sovereignty or its citizens, to surrender a fugitive slave, who escapes from the jurisdiction where he is held in slavery. The rights of the master cease, on common law principles, when the slave, by whatever means, shall escape beyond the operation of the local laws. And this is also the principle of national law. Unless under a treaty or by reciprocal legislation, a slave is free and cannot be reclaimed, when he enters a country where slavery is not sanctioned. And this would have been the case among the states of this Union, had not the constitution and act of congress provided otherwise. But it is supposed that the sixth article of the compact of the ordinance above referred to places Indiana, and also Missouri, on a different footing, in this respect, from the old states. It is true that this compact, or any part of it, cannot be annulled, without the common consent of the parties bound by it. And it is assumed that the people of Indiana, never having assented to any change in the compact, are not bound to surrender a fugitive slave, except when claimed in one of the original states. When the people of Indiana came into the Union as a state, they were as much bound by the constitution of the United States, as the people of any other state. And any and every part of the ordinance which conflicts with the constitution of the Union, so far as the state of Indiana is concerned, was consequently annulled. The common consent required to annul such part of the ordinance is found in the formation of a constitution, and consent to come into the Union, by the people of Indiana, and the acceptance of the constitution and recognition of the state by congress. If it be admitted that while Indiana remained a territory, under the ordinance, there was no obligation to deliver up a fugitive from labor, except when claimed by a citizen of "one of the original states," it by no means follows that her obligation, as a state, is the same. On this subject the constitution acts upon a state and not on a territory. In every instance where the federal constitution imposes a duty on a state or the people of a state, it acts equally upon all the states. The argument that the articles of compact in the ordinance are paramount to the constitution, is unsustainable. The constitution is the fundamental law of Indiana and Missouri, the same as it is the fundamental law of Massachusetts and Virginia. This no one can doubt, who does not consider the ordinance of higher obligation than the constitution of the United States. Where any repugnancy exists between these instruments, the ordinance must yield by the consent expressed by the people of Indiana, and the people of the other states in congress assembled.

In this argument, the question of slavery has been discussed, and the impolicy of the provision in the constitution requiring fugitives from labor to be surrendered. With this subject, in the abstract, this court has nothing to do. It is argued that slavery had its origin in usurpation and injustice, and is continued in violation of the natural rights of man, as declared in our Declaration of Independence; but these are topics which this court will not discuss. We look to the law, and only to the law.

Whatever opinion may now be entertained as to the policy of introducing the above provision into the constitution, at the time of its introduction it was deemed a matter of the highest import. The fruits of the Revolution trembled in the balance, whilst this and kindred subjects were discussed in the convention; and they were settled only by a spirit of compromise and of mutual concession. But if in this and other respects the constitution is less perfect than the parties, on either side, would have it, we are not the less bound by its provisions. If an alteration in the instrument be desirable, let it be made, or attempted to be made, in the mode provided. But while it remains the fundamental law of the Union, no good citizen will disregard its provisions. It was not deemed a perfect instrument, perhaps, in every respect, by a considerable proportion of those who formed it; but it was the best that could be adopted under the circumstances. It has saved us from anarchy and ruin. It has given us a national character, and a proud standing among the great nations of the earth. Under its protection, our commerce has flourished among the several states, and been extended to every sea. It laid the foundation of the prosperity and glory of our country. Whatever defects there may be in the instrument, no one can fail to see that its beneficial results exceed the power of human computation. The demurrer is overruled, and the plea of the general issue being filed, the cause was referred to the jury.

Charge.—Gentlemen of the Jury—From the evidence it appears, that the plaintiff purchased Sam, Mariah, and their child, from one Hendrick, in Missouri, 26th April, 1836, for the sum of eleven hundred dollars, five hundred dollars being paid down. He took the slaves into possession, and they remained with him until April, 1837, when they absconded. These persons formerly belonged to Tipton, a citizen of Kentucky, who, with the slaves, in October, 1835, removed to Illinois. He settled on military land, built a house, cleared ground, and made other improvements, declaring to different persons his intention to become a citizen of the state. Sam and Mariah were both employed in laboring in the fields and in the house, until April, 1836, when they were removed by Tipton to Missouri. Before this was done, there was much conversation in the neighborhood as to the right of the colored persons to their freedom. Tipton started with them before day-light, in the morning, being under some apprehension that they might, if discovered, be rescued. He sold them, in Missouri, to the person of whom the plain-

tiff purchased. Tipton continued to reside in Illinois two years, and, on several occasions, exercised the right of suffrage. In the spring of 1844, the plaintiff heard that the slaves were residing in Indiana, Hamilton county. Taking certain persons along with him, to prove his purchase of the servants, and to identify them, he went to Indiana. Under the statute of that state, he procured a warrant to arrest the fugitives, and a constable to execute the process, and some two or three other individuals, to render any assistance that might be necessary. They proceeded to the cabin occupied by the colored persons, in the morning, before daylight. Admission was refused them. They pried the door from its hinges, and threw down the chimney, when the inmates surrendered, acknowledging the plaintiff to be their master. Time was given to send for a neighbor, who, Sam alleged, was indebted to him fifty dollars. That neighbor arrived, and in a short time others, who expressed a strong interest in behalf of the slaves, and that they should not be taken from the neighborhood. The plaintiff alleged that he had no desire to take the fugitives by force, that they should have a fair trial, and if held to be free, he should be content. He agreed to pay Sam for his improvements, and other property. Some difference of opinion was expressed as to the justice before whom the fugitives should be taken; but the plaintiff finally decided that he would take them to Noblesville, a village some miles distant. They set out for that place, the company continually increasing, until they arrived at Mr. Anthony's farm, where they stopped for breakfast. The plaintiff was averse to this, but yielded, of necessity. After some two or three hours' delay, the company, being greatly increased, set out again for Noblesville. A wagon from Mr. Anthony was procured, to convey the fugitives. They moved on at a very slow pace for a few miles, until they arrived at the forks of the road,—one road leading to Noblesville, and the other to Westfield. Here the company increased to about one hundred and fifty. There was great division of opinion which route should be taken. Mr. Bales addressed the assemblage, urging a submission to law, and saying, "If the decision shall be against us, under our statute, we have a right to an appeal." This pacified a majority, and there seemed to be a general acquiescence in the advice given. But there were some who refused to acquiesce, and among them was the individual who drove the wagon. Receiving some encouragement from persons in the crowd, he drove his horses on the Westfield road. The plaintiff and one or two others attempted to stop the wagon, but they were unable to do so; a shout was raised, and the wagon was driven rapidly. The fugitives escaped, and have not since been seen by the plaintiff. Owen Williams, the defendant, was in the company, at the cabin, at Anthony's, and

at the cross-roads. He took an active agency in the proceedings, in behalf of the slaves, but was not seen near the wagon at the time it was driven off, nor was he heard to encourage the driver. These are the facts, substantially, as proved in the case. The subject is one of great delicacy and importance. Rights are involved, sanctioned by the laws of Missouri, which we are bound to respect; and these rights are asserted under the constitution of the United States and the law of congress.

The second section of the fourth article of the constitution provides, "that no person held to service or labor in one state, under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labor; but shall be delivered up on the claim of the party to whom such labor may be due." The act of the 12th February, 1793, after pointing out the steps necessary to enforce the claimant's rights, in the fourth section provides, "that any person who shall knowingly and willingly obstruct or hinder such claimant, his agent or attorney, in so seizing or arresting such fugitive from labor, or shall rescue such fugitive from such claimant, &c., when so arrested, &c., shall forfeit and pay the sum of five hundred dollars, for the benefit of such claimant," &c. To recover this penalty, this action has been brought. The plaintiff has proved that he purchased and paid for the slaves in question in the state of Missouri, and in justice to him it is proper to remark, that in the prosecution of his claim in this state, he has taken no step which the law did not sanction. He proceeded under the law of Indiana, which, from the decisions of the supreme court of the United States, he was not bound to do. He has shown great moderation and kindness towards the persons claimed as his slaves. In agreeing to pay them for their property and in other respects. And at no time did he evince any other disposition than to have his claim examined by a legal tribunal. That he acted throughout in good faith, believing that his rights were sustainable, there can be no doubt. It seems that the defendant, Owen Williams, from shortly after the arrest up to the time of the escape of the colored persons, took an active agency in the movements of the company. He did not drive the wagon in which the fugitives were conveyed, nor is there any evidence that by word or action he contributed to the rescue, at the time it took place. But if he countenanced and encouraged from time to time, the movements of the crowd which resulted in the rescue, or being present, sanctioned it in any form, he is liable to the above penalty. A man cannot incite others to the commission of an illegal act, and escape the consequences by the plea, that he did not put forth his hand in the consummation of the act. Every one of the one hundred and fifty persons who were present at the forks of the road, and who encouraged the rescue, is responsible to the plaintiff. The combination was unlawful, as its object was to defeat a le-

gal investigation of an asserted right. There is no security for life or property, except in a faithful administration of the laws. That citizens, whether opposed to slavery or not, in principle, should feel and express a solicitude, in a case like the one under consideration, that there should be a full and fair investigation, is natural and commendable. But the course of the law must not be obstructed. No citizen or number of citizens can interpose physical force and defeat legal rights, without incurring a high offence against society. The advice of Mr. Bales was honorable to him, and his example in giving it is entitled to commendation.

But there is another point in the case which is clear of all difficulty, if you believe the evidence, and which may supersede the examination of any other part of the cause: and that is, were not the colored persons entitled to their liberty? Having been brought to the state of Illinois, which prohibits slavery, by their master, from the state of Kentucky, and kept at labor for six months, under a declaration of the master that he intended to become a citizen of that state, and who actually exercised the rights of a citizen by voting, there can be no doubt that the slaves were, thereby, entitled to their freedom. This conforms to decisions repeatedly made by the supreme court of Missouri. Such rulings are of the very highest authority in a case like the present. And it is believed that there is no decision to the contrary. The question has been decided by the highest court of the state, where the right of the claimant to be effective must be sanctioned, and that decision is against him. It is clear that the plaintiff had no knowledge whatever of the removal and employment of the slaves in Illinois, by their former master. The price he paid for them and every act in the case show, that he was wholly ignorant of this. A gross fraud was practised on him by the person of whom he purchased the slaves, and against him or Tipton he may have recourse.

A question is made whether the title to the plaintiff is not good, if the colored persons voluntarily returned into slavery. This question does not arise in the case, as there is no evidence that they went voluntarily to Missouri. But on the contrary, from the manner in which they were removed from Illinois, there can be no doubt that they were forcibly abducted by Tipton. And it appears that they sought the earliest opportunity to escape from their new master. As the claim to the services of these persons is not sustained, if you believe the evidence, which is not contradicted, you will find for the defendant, however improper his conduct may have been. If the fugitives were free, he is not subject to the penalty claimed of him.

The jury in a few minutes returned a verdict for the defendant.

VAUGHAN, The D. W. See Case No. 4,222.

VAUGHAN, The MARY J. See Case No. 9,-217.

VAUGHAN, The MARY JANE. See Case No. 9,216.

VAUGHN (LAMB v.). See Case No. 8,023.

VAUGHN (MIZNER v.). See Case No. 9,-678.

VAUGHT (BLOOMER v.). See Case No. 1,-560.

VAUX (BRUDENELL v.). See Case No. 2,-049.